# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Vickie Gilbert,                                            Case No. 3:18CV2026

        Plaintiff

      v.                                          **ORDER**

Commissioner of Social Security,

        Defendant

This is a social security case in which the plaintiff, Vickie Gilbert, appeals the Commissioner's decision denying her application for benefits.

An administrative law judge (ALJ) rejected plaintiff's claim that her impairments caused limitations that precluded her from performing any work. The ALJ ultimately found that, though she had multiple severe impairments, she had the residual function capacity (RFC) to perform light work with some limitations. (Doc. 11, PageID 119).[1]

Pending is Magistrate Judge Limbert's Report and Recommendation (R&R), which recommends that I affirm the denial of benefits. (Doc. 24). Plaintiff has filed objections. (Doc. 25).

On *de novo* review of the R&R, *see* 28 U.S.C. § 636(b)(1), and for the following reasons, I reverse the denial of benefits and remand under Sentence Four of 42 U.S.C. § 405(g).

---

[1] Doc. 11 is the transcript of the entire record of proceedings relating to this case. Having been scanned into ECF, the document is paginated in blue font along the top of each page. All references to pages within Doc. 11 refer to the ECF pagination.

## Background

### A.  Procedure

Plaintiff filed her application for social security disability insurance benefits on July 22, 2015. (Doc. 11, PageID 263). The Social Security Administration denied plaintiff's initial application on December 9, 2015, (*Id.,* PageID 189), and again after she requested reconsideration of the decision. (*Id.*, PageID 195).

Plaintiff requested a hearing before an ALJ, which occurred on January 12, 2018. (*Id.*, PageID 254). The ALJ denied her application for benefits on May 30, 2018. (*Id.,* PageID 114). The Appeals Council considered additional evidence that plaintiff submitted post-hearing but denied her request for review of the ALJ's decision. (*Id.,* PageID 72).

Plaintiff filed her complaint with this court on September 5, 2018. (Doc. 1). Magistrate Judge Limbert filed his R&R on October 25, 2019. (Doc. 24). Plaintiff filed timely objections on November 7, 2019. (Doc. 25).

### B.  Relevant Medical Evidence

To assess the ALJ's decision adequately, it is necessary to lay out a comprehensive summary of plaintiff's voluminous medical record.

### 1. Cervical and Lumbar Spine

Plaintiff complained of neck and lower back pain on October 28, 2013 at the Lawson Chiropractic Clinic. (Doc. 11, PageID 406). She rated her pain at a six on a scale of ten and stated that the lower back pain was worse. (*Id.* and PageID 410). A lumbar spine x-ray, dated November 14, 2013, showed moderate scoliosis and prominent facet hypertrophy at L4-5, L5-S1, and disc space narrowing at L3-4, L4-5, and L5-S1. (*Id.* at PageID 783).

On February 28, 2014, plaintiff went to Dr. Chandler Arora's office for an initial visit with complaints about her stomach, back, and neck pain, and nearly daily headaches. (*Id.* at PageID 440). She told Dr. Chandler's PA-C, Jessica Toland, about her history of irritable bowel syndrome, severe gastritis, reflux, moderate scoliosis, and, more recently, severe neck pain. (*Id.*). In addition, she told PA-C Toland that she must be careful taking anti-inflammatories because of her gastritis. (*Id.*).

On physical examination, plaintiff's cervical spine showed limited range of motion (ROM) and she had diminished grip strength on the left. (*Id.*). A cervical spine x-ray, taken the same day, showed mild facet arthropathy, left side more prominent than the right. (*Id.* at PageID 454). Plaintiff received a prescription for Fioricet to take as needed (PRN) for headaches. (*Id.* at PageID 441).

She followed up with Dr. Arora's office on April 17, 2014, complaining of chronic neck pain and headaches, claiming that neither chiropractic care nor the Fioricet provided any relief. (*Id.* at PageID 438). She again showed limited ROM of the cervical spine. (*Id.*). PA-C Gisella Oliver prescribed Tramadol for pain and instructed plaintiff to take it PRN. (*Id.* at PageID 439).

Several days later plaintiff had a cervical spine CT scan that showed mild degenerative changes at the atlantodental interval. (*Id.* at PageID 456).

By June 27, 2014, plaintiff continued to have headaches but was not experiencing them every day and tolerating her medications well. (*Id.* at PageID 436).

At plaintiff's next appointment at Dr. Chandler's office on March 3, 2015, she told PA-C Toland that the Fioricet was generally helpful for her headaches, but that some days her headache pain was at a ten. (*Id.* at PageID 429). She was prescribed Imitrex. PA-C Toland instructed plaintiff

to take one pill as needed for headaches and that she could take a second pill, if necessary, after two hours. (*Id*. at PageID 430).

On August 10, 2015, plaintiff went back to Lawson Chiropractic for lower back pain, neck pain, and headaches. A straight leg test was negative bilaterally. Plaintiff also complained of wrist pain and was set up for an appointment with Dr. Antonio Rosario. (*Id.* at PageID 407-08).

She returned to Lawson Chiropractic on December 14, 2015. She complained of lower back pain and had tenderness upon palpation. (*Id*. at PageID 408).

At Dr. Arora's office on December 16, 2015, plaintiff complained of worsening back pain, neuropathy, and weakness in her legs with sharp pain radiating to the foot. Upon physical examination, PA-C Toland noted under the "Objective" heading abnormal left and right lumbar paraspinous musculature ("left and right lumbar paraspinous musculature with trigger points and vertebral tenderness"). (*Id.* at PageID 421).

A lumbar MRI showed mild lumbar scoliosis on the right and bilevel degenerative disc disease and disc displacements at L4-5, L5-S1, most pronounced for rightward radiculopathy at L4-5 where a shallow broad-based protrusion along with facet arthropathy results in mild left and moderate-to-severe right foraminal narrowing and abutment of the exiting right L4 nerve root. (*Id*. at PageID 442).

Dr. Yeshwant Reddy later reviewed this MRI and found degenerative disc disease at L1-2, L2-3, L4-5, and L5-S1; a herniated nucleus pulposus and disc-osteophyte complex with MODIC I change at L4-5; a bulging disc at L5-S1; and facet arthropathy, right and left. (*Id.* at PageID 601). MODIC I change signifies inflammation and edema. *See* Introduction-Types and Terminology, Attorneys Medical Advisor § 71:174 (updated March 2020).

4

On January 11, 2016, plaintiff again complained to PA-C Toland of lower back and neck pain. She had abnormal left and right lumbar paraspinous musculature and vertebral tenderness. (*Id.* at PageID 420).

At Lawson Chiropractic a few days later, she complained of neck and lower back pain. She returned to Lawson Chiropractic again on February 22 and complained of lower back and neck pain, headaches, and pain in both wrists. (*Id.* at PageID 408-09).

At Dr. Arora's office on February 25, plaintiff complained of back pain and said she had good days and bad days. (*Id.* at PageID 418). She was also experiencing difficulty taking NSAIDs due to her history of gastritis. On physical examination, plaintiff had abnormal left and right lumbar paraspinous musculature and vertebral tenderness. (*Id.*).

At Lawson Chiropractic on March 23, 2016, plaintiff complained of neck and back pain with headaches. She did so again on April 6, 2016, also complaining of wrist pain. She claimed that the chiropractic treatments did help. (*Id*. at PageID 490).

A cervical MRI on April 22, 2016, showed mild facet hypertrophy at C2-3; central disc protrusions at C3-4 and C4-5, along with minimal left facet hypertrophy at C4-5; and an annular bulge at C6-7. (*Id.* at PageID 461).

Dr. Yeshwant Reddy later reviewed this MRI and additionally noted facet arthropathy at C4-5 and a perineural cyst on the left at C7-T1. (*Id.* at PageID 601).

In May, June, and July of 2016, plaintiff complained of neck and lower back pain during her chiropractic appointments. (*Id.* at PageID 491-92). In August, she received a referral to see Dr. Yeshwant Reddy for a low back evaluation. (*Id.* at PageID 493).

On June 2, 2016, Dr. Arora's office prescribed Gabapentin, a medication targeting neuropathic pain. She had abnormal left and right lumbar paraspinous musculature and vertebral tenderness. (*Id.* at PageID 549).

At plaintiff's appointment with PA-C Toland on July 7, 2016, she related that the Gabapentin had helped to take the edge off, but again she had abnormal left and right lumbar paraspinous musculature and vertebral tenderness. (*Id.* at 547). At some point, plaintiff stopped taking Gabapentin because of sedating side effects. (*Id.* at 695).

Plaintiff had initially seen Dr. Yeshwant Reddy, whose MRI is noted above, on October 21, 2016. She complained of low back pain with right buttock and radiating leg pain, neck pain with bilateral arm and hand pain, and headaches. Her headaches were responding to diclofenac. She complained of numbness, paresthesia and sensory change. She displayed decreased ROM and tenderness in her cervical and lumbar spine. Dr. Reddy was unable to elicit reflexes in her triceps or biceps. She had diminished wrist joint ROM. (*Id.* at PageID 582-85). He prescribed a series of three lumbar epidural steroid injections and advised her to stay away from all pain medications in view of her generalized osteoarthritis. (*Id.* at PageID 586).

Between October 21 and December 16, 2016, plaintiff received three lumbar epidural steroid injections, but these did not relieve her pain. (*Id.* at PageID 587).

At her appointment with Dr. Reddy on January 6, 2017, plaintiff described aching low back pain, 9 on scale of 10, radiation into her gluteal muscles, and posterior thigh and left hip pain. She stated that the pain was exacerbated by sitting, bending, and twisting, but she found some relief with heat and lying down. (*Id.*). On physical examination, she had facet and paraspinous tenderness in her cervical and lumbar spine. She also had restricted lumbar spine ROM, positive straight leg raise test on the left and positive facet loading test on the right. (*Id.* at 589).

6

At Dr. Arora's office on November 3, 2016, plaintiff had abnormal left and right lumbar paraspinous musculature and vertebral tenderness. She was told to continue Imitrex for her headaches. (*Id*. at PageID 545).

## 2. Upper Extremities

In addition to plaintiff's spinal complaints, she also has a history of upper extremity problems. Her past surgical interventions include right carpal tunnel release in 1989, right trigger finger release in 1990, and right tennis elbow release in 1997. (*Id.* at PageID 386). On January 13, 2015, Dr. Arora found that plaintiff's right wrist was tender laterally and warm. Plaintiff received a wrist brace to use. (*Id.* at PageID 431).

Plaintiff saw Dr. Antonio Rosario on August 14, 2015 for right wrist pain. She told him she primarily felt the pain while gripping and twisting. She had tenderness on palpation of the ulnar styloid process and extensor carpi ulnarius (ECU) tendon. Her wrist motion was abnormal, but she did not display instability. Dr. Rosario diagnosed plaintiff with tenosynovitis and a possible triangular fibrocartilage complex (TFCC) tear. (*Id.* at PageID 386-87).

At an October 9, 2015 follow-up appointment, plaintiff complained of ulnar pain in both wrists, right worse than left. Physical examination of the right wrist showed normal ROM and strength, but plaintiff had mild tenderness over the ECU tendon with ulnar deviation against resistance. (*Id.* at PageID 383).

X-rays of plaintiff's right wrist showed mild distal radioulnar joint osteoarthritis with joint space narrowing and small marginal osteophyte, some osseous ridging/osteophyte formation along the medial aspect of the pisiform bone, and small subcortical cysts in the dorsal distal-to-mid aspects of the capitate. (*Id.* at PageID 389). She received a wrist splint. (*Id.* at PageID 384).

The left wrist showed mild arthritic changes at the first carpometacarpal joint and scaphotrapezium joint, along with slight narrowing of the radiocarpal joint. (*Id.* at PageID 385).

Plaintiff went to Dr. Bernard Nowacki's office on February 24, 2016 for mild to moderate right wrist pain with occasional paresthesia. She had mild tenderness of the distal radial ulna along with limited ROM and decreased strength. He reviewed x-rays and found shortening of the ulna and degenerative changes in the basilar joint. He also found a possible TFCC tear. He ordered an MRI. (*Id.* at PageID 609-12). She received, but was unable to tolerate, prednisone. (*Id.* at PageID 613).

At a follow-up appointment on March 8, 2016, plaintiff's right wrist had limited ROM, mild tenderness over the distal radioulnar, and decreased strength. The MRI showed irregularities for ulnar minus variances, chondromalacia of the lunate, chronic cortical irregularity with subcortical cysts, and mild arthritis at the radioulnar joint. The MRI also showed mild degenerative signal within the radial TFCC without evidence of a tear, and mild tendinosis. (*Id.* at PageID 646).

Dr. Nowacki diagnosed osteoarthritis of the carpometacarpal joint of the right thumb and prescribed a thumb spica brace. He advised her to decrease activity. (*Id.* at PageID 615-16).

Plaintiff returned to Dr. Nowacki's office on March 24, 2016 for a follow-up appointment with the same complaints: mild to moderate pain, worse at night. On physical examination, she had mild tenderness, positive Phalen sign, positive Tinel sign, limited ROM, early Dupuytren's, decreased strength, and pain over the distal radioulnar joint. Dr. Nowacki diagnosed osteoarthritis of the wrist, osteoarthritis of the first carpometacarpal joint, TFCC injury, and chondromalacia of the right wrist. (*Id.* at PageID 617, 619).

On April 7, 2016, plaintiff went to Dr. Nowacki's office complaining of right wrist pain and pain in her cervical spine, both described as mild to moderate. On physical examination, he

noted mild tenderness and limited ROM in her cervical spine. Her right wrist showed mild tenderness over the distal radioulnar joint, limited ROM, and decreased strength. Her recent EMG study showed chronic and acute radiculopathy at C6-7. He noted tendinitis in the wrist with degenerative changes, degenerative changes in the distal radioulnar joint and triangular cartilage with extensor tendon injury, and extensor carpi ulnaris tendinosis. She received an injection into her wrist that day. (*Id.* at PageID 622-23).

Plaintiff returned on April 14, 2016 to Dr. Nowacki's office. The wrist injection helped but she continued to have mild to moderate symptoms that became worse with activity and also some paresthesia. (*Id.* at PageID 625). She had mild tenderness, limited ROM, and limited strength to dorsiflexion. She also complained of cervical pain and had mild tenderness and limited ROM. (*Id.* at PageID 627).

On April 28, 2016, plaintiff saw Dr. Nowacki and complained of mild to moderate pain in her cervical spine that radiated down the right arm and mild to moderate right wrist pain that grew worse with activity. (*Id*. at PageID 630). Again, her cervical spine had mild tenderness and limited ROM, while her wrist had mild tenderness, limited ROM, and decreased strength. Dr. Nowacki found that plaintiff's cervical MRI showed degenerative changes. (*Id.* at PageID 632).

On May 4, 2016, plaintiff began physical therapy to treat her wrist and cervical pain. At her initial appointment, plaintiff indicated that her wrist pain only occurred during movement and twisting. She found that movement such as running the sweeper increased her symptoms. (*Id.* at PageID 657). On examination, her physical therapist found tenderness on palpation over plaintiff's right trapezius, sternocleidomastoid muscle, and sub-occipitals. She exhibited diminished (1+) reflexes bilaterally, positive Tinel's, and limited ROM in the cervical spine and wrists. Grip

strength on the right measured 15, 16, and 16. The left grip strength measured 18, 20, and 17. (*Id.* at PageID 657-58).

She told her physical therapist that the therapy initially helped but the pain returned shortly after treatment. (*Id.* at PageID 661, 663, 665, 669). On May 31, 2016, plaintiff told her physical therapist that she recently had a headache that lasted for two days. (*Id.* at PageID 668).

On August 18, 2016, plaintiff saw Dr. Nowacki's colleague, Dr. Aaron Fritz with complaints of moderate pain in her left hand, fingers, and wrist. She found that movement, lifting, and palpation aggravated her symptoms. Her left hand was tender on palpation over the left thumb and pain was elicited by motion of the hand at the basilar joint with positive grind. Her left wrist showed tenderness on palpation over the first dorsal compartment and pain was elicited by motion of the wrist. She showed a positive Finkelstein's test. Dr. Fritz diagnosed her with tenosynovitis and basilar joint osteoarthritis of the left thumb. She received an injection in the wrist. (*Id.* at PageID 734-35).

Throughout her lengthy course of treatment, plaintiff's pain medications changed multiple times to relieve her pain. At various times, plaintiff was taking diclofenac, Ultram, tramadol, Imitrex, hydrocodone taken three times daily, and Gabapentin, all for pain and headaches. Additionally, she was prescribed cyclobenzaprine for muscle spasms, and hyoscyamine and omeprazole for stomach issues.

With the exception of omeprazole, all these medications are known to cause drowsiness. *See generally* Physicians' Drug Reference, retrieved from http://pdr.net. The record indicates that the plaintiff experienced drowsiness from these medications. (Doc. 11, PageID 305, 312, 345).

## Findings of the ALJ

The ALJ determines disability under the Social Security Act through a five-step sequential

evaluation procedure:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4).

The ALJ made the following findings of fact:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 1, 2013 through her date of last insured of December 31, 2016.

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc and joint disease of the cervical and lumbar spines, dextroscoliosis, radiculopathy, migraine headaches, osteopenia, osteoarthritis of the bilateral wrists, status post carpal tunnel release of the right wrist, tenosynovitis of the left wrist, and osteoarthritis of the bilateral thumbs.

11

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the [plaintiff] can frequently push or pull with the right, perform handling, kneel, and crouch. She can occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, crawl, and be exposed to wetness and environments where the temperatures are less than 40 degrees Fahrenheit.

6. Through the date last insured, the claimant was capable of performing past relevant work as an Office Coordinator and Hospital Admitting Clerk. This work did not require the performance of work-related activities precluded by the [plaintiff's] residual functional capacity. 20 C.F.R. § 404.1565.

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 1, 2013, the alleged onset date, through December 31, 2016, the date last insured. 20 C.F.R. § 404.1520(f).

*See* Doc. 11, PageID 114-28.

**Standard**

I review the ALJ's decision in a social security case de novo. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). My review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ employed the proper legal standards in reaching his conclusion. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Regarding the substantial evidence requirement, I must affirm the ALJ's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Kendrick v. Astrue*, 886 F.Supp.2d 627, 630 (S.D. Ohio 2012) (Rose, J.) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted).

Nonetheless, "[e]ven if supported by substantial evidence… a decision of the [ALJ] will not be upheld where the Social Security Administration fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen* at 746.

Substantial evidence is "more than a mere scintilla of evidence, but less than a preponderance." *Walton v. Astrue*, 773 F. Supp. 2d 742, 744 (N.D. Ohio 2011) (quoting *Cutlip v. Sec'y of Health & Human Servs.* 25 F.3d 284, 286 (6th Cir. 1994)). I must review the administrative record as a whole to determine the existence of substantial evidence. *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535-36 (6th Cir. 1981).

## Law and Analysis

### A.  Treating Source Rule

In the Sixth Circuit, a treating source's assessment must receive controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Sawdy v. Comm'r of Soc. Sec.*, 436 Fed. Appx. 551, 553 (6th Cir. 2011).

The ALJ generally gives deference to the treating source's opinions "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone…" 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).

Where the ALJ does not give a treating source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treating relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. 20 C.F.R. § 404.1572(c)(2)-(6).

13

The ALJ must provide good reasons for discounting the weight given to a treating-source opinion. *Id.* at § 404.1572(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p.

The Sixth Circuit has summarized the hierarchy of medical opinion evidence:

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2). "[T]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. R. No. 96-6p.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

With respect to the treating source rule, the regulations do not allow the ALJ to apply greater scrutiny to a treating source opinion to justify giving such an opinion. "A more rigorous scrutiny of the treating source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Id.* at 379. An ALJ's failure to apply the same level of scrutiny to the opinions of the consultative doctors on which he relied, while applying greater scrutiny to the treating sources demonstrates the ALJ's failure to employ the proper legal standards and calls into question the ALJ's analysis. *Id.*

Before embarking on an evaluation of the weight the ALJ gave to the treating source opinion and the consultative examiner's opinion, it is important to emphasize that Dr. Arora, the treating physician, considered a far more extensive medical record. Dr. Ellen Offutt did not have

14

the additional benefit of reviewing treatment records after November 25, 2015, more than one year before plaintiff's date last insured.

### 1. Dr. Chandler Arora – Treating Source

On December 8, 2017, Dr. Arora filled out a General Physical and Mental Impairments document. He listed the following diagnoses: mild disc bulge at L4-5, degenerative changes at L5-S1, lumbar facet arthritis, degenerative cervical spine, generalized anxiety disorder, and major depressive disorder. He recommended the following limitations: Patient can work eight hours per day, stand for thirty minutes at a time, stand for four hours throughout the work day, sit for thirty minutes at a time, and sit for four hours throughout the work day. She can occasionally lift twenty pounds and can frequently lift ten pounds. She can occasionally stoop, bend, and balance. She can engage in occasional fine and gross manipulation of both hands and raising her arms over her shoulders. He indicated that she can constantly operate a vehicle and tolerate heat and cold. His opinion was that claimant suffered from moderate pain. She would likely be absent from work four days per month and be off-task 10-15% of the workday.

The ALJ explained the weight he gave to Dr. Arora's opinions:

> Little weight, however, is given to the opinions provided by the claimant's treating provider, Chandler Arora, M.D., as it is inconsistent with the overall evidence, including Dr. Arora's own examination notes. Overall, the records generally document the claimant's condition as mild. For example, imaging of the claimant's cervical and lumbar spine showed mild degenerative changes. The records generally document the claimant to have a normal gait, strength, and sensation of the bilateral upper and lower extremities. Even when the claimant did exhibit some decreased range of motion, no instability was noted. As such, the undersigned finds that the limitations provided by Dr. Chandler in Exhibit 41F are not supported by the overall records. (internal citations omitted).

(Doc. 11, PageID 126).

15

Since the ALJ did not give Dr. Arora's opinion controlling weight, he should have weighed the opinion based on the length, frequency, nature, and extent of the treating relationship, as well as Dr. Arora's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.

While his opinion did not discuss the length, frequency, nature, extent of the treating relationship, or Dr. Arora's area of specialty, he did find inconsistency with his own treatment and with the overall record. However, the explanation is vague at best.

He claims that the imaging of plaintiff's lumbar and cervical spine shows only mild degenerative changes. However, he does not explain how numerous findings on those same MRIs and other imaging scans, such as a herniated nucleus pulposus, "a condition in which part or all of the gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain, possible nerve root irritation, and radiculopathy," (*Glossary of Medical Terms*, 2 Soc. Sec. Disab, Claims, Appendix 23) (*Id.* at PageID 601), and disc osteophyte complex at L4-5, prominent facet hypertrophy and moderate to severe foraminal narrowing with abutment of the exiting nerve root at L4, and radiculopathy at C6-7, among other things, are considered mild when not characterized as such in the records.

In short, the explanation the ALJ provides for the weight of Dr. Arora's opinion is not sufficiently specific to permit meaningful review of his decision. It is unclear whether he simply did not consider these findings supportive of and consistent with Dr. Arora's opinion or whether he considered and disregarded the medical records and made his own determination that the findings were mild in nature. What is clear is that the ALJ focused acutely on findings that used the word "mild," and did not consider the overall record. In any event, this does not permit meaningful review of the ALJ's decision.

### 2.  Dr. Ellen Offutt – Consultative Examiner

The ALJ gave great weight to the consultative examiner, who examined plaintiff once on

November 25, 2015:

> Great weight is given to the opinions of consultative examiner Ellen
> J. Offutt, M.D. Based on the claimant's examination, Dr. Offutt
> opined that the claimant's ability to perform work-related activities,
> such as bending, stooping, lifting, walking, crawling, squatting,
> carrying, traveling, pushing, and pulling heavy objects is mildly to
> moderately impaired. In general, this is consistent with her
> examination of the claimant, and the overall records, and thus is
> supportive of the above residual functional capacity. Dr. Offutt's
> opinions are also supportive of finding the claimant capable of
> performing light work with the additional restrictions enumerated
> above. For example, during the claimant's consultative examination,
> good range of motion and use of all extremities was shown, aside
> from some finger bending issues. This is consistent with the overall
> records, which generally note the claimant to have normal gait,
> strength, and sensation of the bilateral upper and lower extremities.
> (internal citations omitted).

(Doc. 11, PageID 126).

> Dr. Offutt's opinion is, in part, based on the following medical records:

> The medical records that accompany this chart show that she has
> had a negative unenhanced CT of her brain to investigate her neck
> pain and headaches. She has had a CT of her cervical spine without
> contrast which showed very mild degenerative changes at the
> atlantodental interval. There is minimal redundancy of the annulus
> and very small annular bulges. No disc herniation or stenosis. There
> is an x-ray dated November of 2013 of the [lumbar spine] that shows
> moderate scoliosis with spondylitic changes and mild degeneration
> in the lower lumbar spine.

(Doc. 11, PageID 397).

It is unclear whether Dr. Offutt reviewed other notes and treatment records dated prior to

November 25, 2015.

Simply put, there is no credible way to argue that Dr. Offutt's opinion is consistent with

the overall records. She considered less than half of them and subsequent records are replete with

objective medical evidence that detracts from her opinion. After this consultative examination, plaintiff's imaging of her lumbar spine showed a herniated nucleus pulposus at L4-5, moderate to severe neural foraminal narrowing at L4-5 on the right, a bulging disc at L5-S1, cervical disc bulges and osteophytes, limited ROM and elicitable signs of abnormality in her wrists, numerous medication changes, and increasingly aggressive treatment for pain.

The ALJ's application of great weight to Dr. Offutt's opinion, despite the lack of support from the rest of the record, certainly shows a failure to carefully review the opinion in relation to the overall record.

His determination that Dr. Arora's opinion was inconsistent with the rest of the record despite a litany of findings not characterized as "mild," and juxtaposed with his determination that Dr. Offutt's opinion was consistent with the rest of the record despite her consideration of less than half of it, indicates that the ALJ did not consider these opinions under the same level of scrutiny; rather, he subjected Dr. Arora's opinion to greater scrutiny than Dr. Offutt's. This is a clear failure to employ the proper legal standards to evaluate medical opinions, 20 C.F.R. § 404.1527, and calls into question his analysis of the plaintiff's record. *Gayheart, supra,* 379.

Even if Dr. Arora's opinions do not warrant controlling weight, "they must still be weighed as the regulations prescribe, with no greater scrutiny being applied to his opinions than to those of the nontreating and nonexamining sources." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 380 (6th Cir. 2013).

An ALJ's breach of the treating source rule may be excused as harmless error only if: 1) the opinion issued by the treating source rule is so patently deficient as to make it incredible; 2) the Commissioner implicitly adopts the source's opinion or makes findings consistent with it; or 3) the goal of the treating source regulation—to safeguard the claimant's substantial procedural

18

rights—is satisfied despite noncompliance. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (*citing to Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).

In this case, the error was not harmless. Dr. Arora's opinion was not patently deficient; the ALJ gave the opinion some weight. The Commissioner did not adopt Dr. Arora's assessment or make findings consistent with it. Finally, because the ALJ's decision to give little weight to Dr. Arora's opinion is not explained in a manner so as to permit meaningful review of his decision.

### B.  Residual Functional Capacity

The plaintiff claims that the ALJ erred by failing to recognize the effects plaintiff's migraines have on her residual functional capacity. (Doc. 20).

The ALJ is responsible for assessing a plaintiff's residual functional capacity, 20 C.F.R. § 404.1546(c), *i.e.*, "the most you can still do despite your limitations." § 404.1545(a)(1). He or she will assess a plaintiff's residual functional capacity "based on all of the relevant medical and other evidence." § 404.1545(a)(3).

In this case, the ALJ considered the evidence related to her back, neck, and associated headache conditions and determined that the mild physical findings do not support the frequency and severity of the plaintiff's symptoms, but that her limited ROM and tenderness warranted some limitations. (Doc. 11, PageID 123).

The Sixth Circuit instructs that '[w]henver a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007).

The ALJ's determination must be reasonable and supported by substantial evidence (*Id.* at 249); it cannot be based upon an "intangible or intuitive notion about an individual's credibility. Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

The ALJ is to consider objective medical evidence and other factors when evaluating the veracity of the plaintiff's subjective complaints of pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; 5) treatment, other than medication; 6) other measures plaintiff used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain.

An ALJ must explain his credibility determinations such that it "must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Rul. 96-7p, at *4. Substantial evidence must support an ALJ's assessment of a claimant's credibility. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ discounted plaintiff's subjective statements about the frequency and severity of her headaches. He noted that plaintiff's headache questionnaire, dated March 22, 2016, stated that her headaches occurred four to five times a week and would last for several hours at a time. The ALJ found that the medical records did not support her complaints, noting that such frequency and severity were not documented in the medical records at that time. (Doc. 11, PageID 122). To support this conclusion, the ALJ cited to examination notes from April 2016 that showed mild cervical spine tenderness and limited ROM, cervical imaging displaying mild facet arthropathy

20

and tiny central disc protrusions at multiple levels, and an annular bulge at C6-7. He acknowledged plaintiff's EMG study showing acute and chronic radiculopathy at C6-7[2].

Additionally, he determined that the plaintiff was not compliant with taking her medication as prescribed, stating "during her consultative examination, the claimant indicated that she was taking her headache medication only once per day, although it was prescribed to be taken twice daily." (*Id.* at PageID 125). The medication the consultative examiner referred to was diclofenac. (*See Id*. at PageID 395).

A careful review of the record, however, reveals that substantial evidence does not support the ALJ's adverse credibility determination.

First, the Social Security Administration has stated:

> [I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We *will not* find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. (emphasis provided).

(Soc. Sec. Ruling 16-3p, 2016 WL 1237954).

The transcript of the hearing before the ALJ shows that he did not ask why she failed to take her medication as prescribed. However, the ALJ need not have asked the plaintiff because even a cursory review of the medical records detail plaintiff's long history of difficulty taking

---

[2] To be clear, Dr. Bernard Nowacki stated that plaintiff's EMG showed C5 radiculopathy, acute and chronic, (Doc. 11, PageID 623), which is what the ALJ noted in his decision. However, the results documented by the provider conducting the study showed right C6-7 radiculopathy, acute and chronic.

NSAIDS and other anti-inflammatories due to gastric issues. (Doc. 11, PageID 418, 429, 438, 440, 584, 588, 593, 598, 611, 615, 618).

There is not substantial evidence to conclude that plaintiff was inexcusably noncompliant with her medications.

The ALJ also found that plaintiff's daily activities were not as restricted as claimed.

> Additionally, the claimant's daily activities are not restricted to the extent that she would be precluded from the range of work assessed herein. The claimant reported that she sees her goddaughter's children off to school, makes simple meals, and performs household chores, such as dishes, with breaks, small loads of laundry, and dusting. She can drive and go grocery shopping and has no problems toileting, feeding herself, or bathing, though she does wear slip on shoes, has to sit to shave, and has pain when using her curling brush above her head. The records also show claimant to be independent in her activities of daily living, and able to perform housework and cooking. Finally, the claimant was able to attend the hearing proceedings and participate in a meaningful way.

(*Id.* at PageID 125).

This summary of the plaintiff's daily activities is misleading and fails to examine the physical effects those activities have on plaintiff.

Specifically, plaintiff indicated that she does little driving because it causes symptoms in her wrists and hands and that when she does drive it is only if she has not taken her pain medication because it makes her sleepy. Plaintiff's simple meals take five to ten minutes to make and consist of mainly sandwiches and frozen dinners; she used to be able to make full meals but cannot stand up long enough in the kitchen to do that anymore. She can do dishes but must take a break and return to the task later. She only does small loads of laundry once a week. She dusts once a month for approximately a half hour. She goes grocery shopping once every two weeks and gets in and out as quickly as possible. Her mother, with whom plaintiff lives, does the rest of the housework and all of the yardwork. (*Id.* at 347-48).

22

While the ALJ places great emphasis on her daily activities to support his residual functional capacity determination, he does not explain how her ability to perform household chores several times a month, see her goddaughter's children off the school, handle personal hygiene care, and feed herself translates into her ability to perform light work, with limitations, for eight hours per day. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (finding that activities such as driving, cleaning an apartment, caring for pets, reading, exercising, and watching the news "are not comparable to typical work activities"). Substantial evidence does not support the ALJ's characterization of plaintiff's activities of daily living.

The ALJ also did not properly consider the other factors relevant to plaintiff's credibility. He did not consider the effects that plaintiff's multiple pain medications would have on her ability to work. As previously discussed, the majority of plaintiff's medications cause drowsiness, including medications prescribed for her headaches. While he made passing references that plaintiff took Imitrex and Gabapentin and that they helped her, this is the extent to which he assessed her medications. A proper assessment of plaintiff's medications would tend to support her subjective complaints of pain.

As it relates to the credibility determination, the ALJ did not assess plaintiff's extensive and aggressive treatment record, which would also tend to support her subjective complaints of pain. She engaged in chiropractic treatment, massage therapy, injections, and a few rounds of physical therapy treatments.

It is clear that the ALJ failed to appropriately consider the factors relevant to plaintiff's credibility and placed too much significance on her ability to perform activities that are not comparable to typical work activities. Had he done so, his credibility determination, in all probability, would have been in favor of the plaintiff.

23

The ALJ's residual functional capacity does not reflect any common sense limitation related to plaintiff's headaches because he discounted her statements about the physical toll the headaches took on her, including sometimes needing to lie down in a dark room until the headache passed because her medications did not always relieve the pain, and that her headaches often caused her to feel a sense of motion sickness. Had the ALJ found these statements to be credible, the residual functional capacity determination would, in all likelihood, be more limiting. As such, the residual functional capacity determination is not supported by substantial evidence.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT:

1. The Magistrate Judge's Report & Recommendation be, and the same hereby is not adopted; and

2. The decision of the Commissioner to deny benefits be, and same hereby is vacated and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

So Ordered.

/s/ James G. Carr
Sr. U.S. District Judge